Chalmers et al. v. National Collegiate Athletic Association Chalmers et al. As you can imagine, I have to adjust it a lot when I'm up there. So, Mr. Abrams, you've reserved two minutes for rebuttal, and you may begin when you're ready. Thank you, Your Honors, for having us this morning. My name is Elliot Abrams, and I represent Mario Chalmers and the other former student athlete plaintiffs in this matter. I'd like to focus on the timeliness of Claim 1, which is our horizontal price-fixing claim. We believe that this claim is controlled by two questions, which are factual questions related to what's in our allegations. The first question is, what is the antitrust act that we've alleged we're harmed by? And the second question is, when did that act occur? At Appendix 44, Paragraph 66, we allege that each commercial use of the images and footage of us by the NCAA and its members constitutes a new and independent act and causes us discreet and additional injury because we would be compensated for such use but for the ongoing horizontal price-fixing conspiracy. But that horizontal price-fixing conspiracy is put into effect and takes – sort of put into action at the moment those allegedly coerced agreements are signed, doesn't it? It does not, Your Honor, and the reason it does not is that we did not give the NCAA the right in any agreement that we allege that we signed to do what they're doing today. We have the agreement. It's at Paragraph 123 of our complaint. It's at Appendix 68. It says you authorize the NCAA to use your name or picture to generally promote NCAA championships or other NCAA events, activities. What is there that you couldn't have brought at that time? Why – I mean realistically, why are you asking us now to go back to things which were before, which could have been claimed and word? What was not before and is happening today are the NCAA's use of our likenesses today. Yeah, but wasn't this all at that time? It was not, Your Honor. For example, the very first video that we have in the complaint wasn't posted by the NCAA until 2022. It's a video at Appendix 45 that we have a screenshot. Why isn't that a video that is designed to promote NCAA events, activities, or programs? It's not, Your Honor, because as we've alleged, it's designed for the NCAA to make money. Of course. They're all designed to make money. That's what this whole scam of amateurism was always about from the beginning. It's always about making money. That's what NCAA events, activities, and programs are designed to do, is it not? I don't believe that when we signed these forms that we authorized the NCAA to use our likenesses and our names to make money from Walgreens and Geico and third-party advertisers 10 years later and all the way to the future. If they just put on a video that says, watch the March Madness finals, when you do watch the March Madness finals, there will be advertisements from Geico, etc., etc., etc. And all of that money or some portion of that money, depending on what deal they made with the networks, etc., is going to the NCAA, right? It is, Your Honor. So then what is the distinction? What is happening here that is something novel? What's novel is the fact that we are former student-athletes that are watching ourselves and our performances on the Internet and on TV today. First of all, that doesn't matter because it says that the NCAA is authorized to use your client's name or picture. So the fact that they're seeing themselves and not making money for it is true as to all of the uses of their name, image, and likeness, right? It is. My response to that, Your Honor, is we – there's at least a very real factual question about whether we authorized the NCAA to do what they're doing today. There's nothing in this release that says that. I'm sorry. That's exactly what I'm asking you about is to identify what is different about what they are doing today than what your clients authorized back in the day. Back in the day, Your Honor, we anticipated the NCAA would use our images while we're student-athletes. We did not anticipate that they would use our images forever into the future. Where in this language is there any restriction on the time during which the NCAA or third parties acting on their behalf will use the name or picture of a student-athlete? Your Honor, it's not in the specific language which I believe helps us because we are at the 12B6 stage. We've alleged that we did not believe this was perpetual. Well, suppose you didn't. So what? You didn't even know that – I mean, there are going to be all kinds of new inventions over time. Things are going to be shown on streaming, on computers, on cell phones that weren't even in the mind of God at the time that this contract is signed. When people sign contracts that sign away a certain right, sign away the right to use their image, for example, what – there's no – you could draft a contract that says you're authorized to use our name, image, and likeness in the following ways in the following media. But if you just say to use our image and likeness and somebody comes up with a 3D immersive NCAA experience, why is that not covered? It's not covered, Your Honor, because we've alleged that we did not – I have three responses. The first is that this contract does not give them perpetual rights. We did not believe it gave them perpetual rights to the extent that that's an issue. It's a factual issue. Why is that not a legal issue? It's a legal issue as to what the terms of the contract provide, isn't it? Your Honor, the contract is not in evidence. It's not in our – It's in your allegation. You've got – we're reading the thing that you put in your complaint. Yes, Your Honor. Right? That's the language that I am addressing. Yes, and we followed it up by saying that this did not give them a perpetual right. So there's – That's a legal – that's a legal argument, isn't it? It's a legal argument that requires facts to understand what the parties – We look first to the language and ask if there is any ambiguity. Yes, Your Honor, and how we've pled this is that this was one part of a very long contract. It wasn't itself the entirety of the contract. Counsel, you allege that they somehow kept you from suing earlier about these and that that, as to the injunction part, which is equitable, should allow you to do it. But I don't see anything of that. Could you give me a little bit more meat about what your claim on that is? Yes, Your Honor. The claim is that for pretty much forever as the NCAA has operated, it's been given this veil of immunity from the antitrust law. And all of that changed in Justice Kavanaugh's concurrence. The veil of immunity may have been there, but that isn't the parties doing something, which is what traditionally we have said is required for that claim of keeping you from suing. Do you have a case that tells me that there is a veil of that sort that is enough? I do not have a case on that, Your Honor, and that's why I'm focusing on the horizontal price-fixing claim, which is separate from count two. You're saying, I take it – I mean, you've got three basic ways of avoiding statute of limitations or laches, right? And you've been addressing the first one, which is that new acts have taken place that reset the statute of limitations. Yes, Your Honor. And the questions that Judge Calabresi was asking, you would say, relate more to the third, most obviously, equitable estoppel and possibly the second. Yes, Your Honor. And we believe that this case is controlled by a well-established principle that if there's an ongoing price-fixing conspiracy, that every sale of the – by the price-fixer that harms a supplier restarts the statute of limitations. And this – my opponent's argument is look at Varner. Well, but the price-fixing – the sale of the – the use by the NCAA by conferring on somebody else the – whatever rights the NCAA either did or didn't have to do this. That's – there's no price-fixing involved in that, is there? There is, Your Honor, if you take our complaint as true, which is that any assignment of rights did not authorize the conduct of question. Oh, yes, of course, of course. So that brings us right back to the question. I mean, after all, what we're – the price-fixing conspiracy was fixing the price of student athlete labor, right? That's our second claim. Our first claim is an ongoing price-fixing conspiracy to sell our rights that we have today and to pay us nothing for them. Well, that's a conspiracy to fix the price of ex-student non-labor or something like that, right? I mean, the conspiracy is that all the colleges, who for some reason aren't sued, all the colleges got together and said none of us are going to pay student athletes more than this, right? That's the conspiracy that we're talking about. It is not the conspiracy at count one. It's the conspiracy that we've alleged at count two, which goes back – What is the – I don't understand, then. What is the conspiracy in count one? At count one, the conspiracy is to use our rights that we have today and to sell them to third-party advertisers. Wait, wait, wait, wait, wait. No, the whole issue is whether you have those rights today. Yes, Your Honor. Right? I mean, the price-fixing, you're fixing – or they're fixing, the bad guys are fixing the price of the rights that athletes have in their name, image, and likeness after they graduate at zero. Correct. Why wasn't that part of the conspiracy from the beginning? I mean, Aaron Judge, I suppose, has a right in his body and activities and image and name when he appears in the World Series. I assume that he is richly compensated not only for playing the game but also for giving up in perpetuity his right to say, when Major League Baseball invents ten years from now World Series, the immersive experience that you can go to and feel like you're throwing the pitch to Aaron Judge, that's something that he gave up and that's in his original contract because he gave up the right. This is part of what he's getting compensated for. Yes, Your Honor. And your guys were being compensated at roughly zero or at least the tuition at a school in which they can't even choose what courses they're going to take and probably can't even manage to graduate on time because they have to go and professionally practice for all the money they're going to make for their coaches and their schools. Yes, Your Honor. Isn't that the conspiracy from the beginning of time? Still today, to whatever extent they can manage it, but they can't manage it very much anymore thanks to injunctive relief that other people, by the way, figured out. Notwithstanding the veil of immunity that they could sue for, and they figured that out in 2014 or before. At 2009, I think, isn't that when O'Bannon files his first lawsuit? Well, yes, Your Honor, but O'Bannon's was still – they were still covered effectively by the veil of immunity then, but I don't – the two different – But the point – I guess I'm getting off into the other thing because all of this really has to do with what is equitable here because the statute of limitations is long dead here. What can revive that? And it's a little hard for me to see why anybody who had ever been a student athlete didn't have the ability, if not when O'Bannon came up with a creative theory, certainly by the time that he won, certainly by the time that Alston is filing lawsuits, certainly by the time that damages are actually being calculated and awarded in a settlement, all of that stuff happened. And your guys didn't file suit until more than four years after those events took place, those lawsuits took place. And I'm trying to figure out why we would want – why the world is better. I mean, I suppose you could say the world is better if these people get compensated than if they don't. But why the world is better if we sort of blow up the statute of limitations somehow by following your rule? I have two responses. The first is that our unjust enrichment claim simply says that the NCAA and its members continue to profit unjustly by pocketing – by their aged theft. If you find that they stole our rights years ago, it's unjust to let them continue to profit from that theft. Does that mean that if my grandfather was extorted out or defrauded out of his shares in a profitable business by his business partners in 1955, that every time that business makes a sale or makes a profit, that the statute of limitations is reset? Or is this a special antitrust rule? This is not a special antitrust rule, Your Honor. Let me give you another perhaps trivial or stupid exception. The courts of this country were not given raises consistent with inflation. At a certain point, the judges or some judges sued, and it went up to the federal court claims, and we won. That from that time on, the Constitution's requirement that our salaries not be lessened would take account of inflation. Does that mean that those of us who were judges before could come and say all the years before we were being cheated because the effect that we didn't get those is costing us money now? And boy, it is huge amounts. But isn't that exactly – I mean, you know, I'd love it to come out that way, but how can we possibly say that? The reason that this is different is there are ongoing uses. Mario Chalmers sees a video on NCAA.com that says watch Mario Chalmers hit clutch three-point shot. He then sees advertisements that he has to watch before he can watch himself. And your theory is that that was unexpected? That's unexpected. Okay, so I don't like to talk about this, but in 1985, Villanova beat Georgetown. And I see that freaking shot every year, every year, starting in 1985 until the end of time. That shot in that game is going to be played at – it's like early March. I have to turn off the TV, right? And it's been like that. It was like that when I started at Georgetown in 1989 and when I graduated from Georgetown in 1993. And at all of those stages along the way, that video has been shown. So these kids – I call them kids. They're grown now. But these folks were athletes long after I was at school and long after that kind of thing had started happening just on CBS, right, on the March Madness CBS feed, not through the Internet. But that was a thing, and I'm confused as to why they wouldn't have known that those – you know, like Ryan Boatwright has a great famous shot, right? Mario Chalmers was a brilliant player. These are guys who, you know, should have expected that. I'm confused at this claim that they didn't see this coming. Your Honor, they didn't see it coming because of what the release and the context around the release covers. It doesn't say that they can use your name, image, all of your athletic performance. So they thought that Patrick Ewing and whoever else, you know, they thought that the guys who came before them were getting paid every time that video showed up, that their expectation that those folks before them, you know, all of those stars from the 80s and 90s that they grew up watching, that when they saw that video, those guys were getting paid every time, and that that's what this deal would mean for them. Your Honor, I don't know what they thought as to Patrick Ewing. What I do know is what's in the release, and the release does not authorize the NCAA to do what it's doing today. It's not just generally promoting. It's promoting, and this, as we allege as well, the circumstances around that release are so coercive that we shouldn't enforce that release today. There is an ongoing. Well, that's probably true, of course, except for the statute of limitations. Right. I mean, of course, by today they don't put this in anymore, right? I think they do this. You call it a release, this transfer of rights in paragraph 123 of the complaint. That's not in current student-athletes' contracts. Today's student-athletes are paid, so they probably do sign over their rights in exchange for a payment. But they get paid. Yes, Your Honor, and it's probably a more detailed release. We also allege that they couldn't have lawyers. We have a whole circumstance. Of course, that's all true. Of course, that's all true. But that shows why it was wrongful behavior. And that's our claim two. Our claim one is that this release does not authorize the conduct in question. Well, can you then – my last question is going to be, you referred earlier to the context. Can you point me to whatever is your best piece of the agreement that casts doubt on the turn during which this transfer of rights is going to be effective? Yes, Your Honor. It's just the release itself, that it doesn't say it's perpetual. The fact that it does not say perpetual means it lasts while you are participating in the athletic program. Yes, Your Honor. And because, as we talked about – Is there any language anywhere – I mean there's a whole bunch of stuff that the student athlete gives up, right? So are you saying that if, for example, one of your clients decided that he was going to pursue a career as a rap musician rather than as an athlete, dropped off the basketball team, and then put out a rap recording talking about his exploits on the basketball court and why he didn't like the NCAA and what his career had all been about, and had a video showing that showed some of his basketball exploits that accompanied that, that would all be covered by this or it would not be covered by this. I mean he's no longer participating in the athletic program at that point. He's still a student at the school. That's right, Your Honor. There's two ways to read this. One is this comes as part of, as we've alleged, as part of an eligibility form. So everything else in the form relates to your time at school, what you can and can't do while you're at school. And so the context of the form is all about your time as a student athlete. So that's why we don't think it's perpetual because this is within the context of an eligibility form. And we've alleged that this form did not authorize the conduct in question. We also think general promotion does not include what we've alleged they're doing here. They're using Mario Chalmers' name not to promote any NCAA event but simply to make money from third parties. He's watching them do that and pocket the money today that if we started today, there's no question that what they did years ago to get this form is illegal. That may be time barred. That's claim two. But claim one is all the schools today are all getting together through the NCAA and agreeing to not pay him for that. And we think if we ask the presidents of individual schools, would you pay, if we went to Kansas, would you pay Mario Chalmers if this was your individual decision? We think they would say yes. We don't think they would say, no, we're going to continue to profit off of aged misconduct. It's because they're all acting together that he's not getting paid. That's why it's an ongoing price-fixing conspiracy because if we break them up and they have to make this choice individually, we think they would do the right thing, Your Honor. But if we believed that – if we conclude that this language does apply indefinitely and transfers all the athletes' right to their name, image, and likeness, that would be the end of it, would it not? It would be, Your Honor. We think that would be a summary of judgment. But you're saying that is somehow a factual question as a matter of the law of contracts. We at least need to see the contract before we can decide whether it applies. We have what we think that – we think they signed a contract that contains this language. And we – but we say there's an ongoing price-fixing conspiracy. But you have to show now that it is plausible because how you get the contract is in discovery, right? So you have to satisfy Twombly that it is a plausible claim that this language does not say what it appears to say. I mean on a factual reading, I guess you're going to say this language somehow has to say you authorize them to use these – your name and picture implies for four years unless it says otherwise. That or that general promotion is not exactly what they're doing. Let me ask it in a different – slightly different way. Are you arguing that if individual heads of companies, presidents or whatever, would, if asked individually, make a gift that they have no contractual obligation to make but that they wouldn't do it because together they have talked and say let's not make a gift, that that is an antitrust violation? Because that really is what you were just saying to Judge Lynch, that somehow because an individual president might say, vote, let's assume we have no contractual obligation, I'd like to pay these kids. Then the fact that another president says, hey, I'm not paying that guy, and others do, but that's an antitrust violation. I've never seen that. I've never seen a case where what it is is voluntary behavior would become an antitrust violation if people say, hey, let's not do it. Yes, Your Honor, my answer to that is that companies that have no legal obligation to pay more than minimum wage, they have no legal obligation to pay more than that. But if they all get together and say we're only going to pay minimum wage, unquestionably, if you're doing that with your competitors, that's a horizontal price mix. Right, but in that case, you are fixing the price of labor, the labor that the individuals are today performing. And they're entitled to the minimum wage. They'd like to get more. And the companies band together and say we're not going to give them more. But here, the labor was provided years and years ago under the terms of this contract. So it's a little hard to see how what we're talking about here is a price-fixing conspiracy because the thing that is at issue is – I mean, let me see. You're saying that really this is about – and I guess it again comes back to what was in the original contract. This is a freestanding conspiracy to not pay them today for rights that you have to maintain they did not sign away back when they became student-athletes. Yes, Your Honor. So it all still hinges. Everything hinges on the notion that this contract is at least ambiguous as to its term and as to what constitutes the promotion of NCAA activities. Yes, Your Honor. So we would ask the opportunity for discovery so we can answer that question, and we appreciate very much your time. Thank you. Thank you, Counsel. Luckily for you, you'll get to come back for another two minutes in a little bit. Thank you. We'll hear now from Mr. Kilaru. Thank you, Your Honor. Rakesh Kilaru on behalf of the NCAA. As the case comes to the court, there is no dispute that the statute of limitations period has run. And so the question Judge Engelmeyer was faced with was whether the plaintiffs had plausibly alleged an entitlement to three different exceptions to the statute of limitations period. And he correctly concluded that they did not. I think to start with the first, which is the continuing violation theory, the relevant question I agree with, Counsel, is what is the act that the plaintiffs are saying injured them and when did that occur? And their complaint tells us it was the signing of a contract that they claimed they were forced to sign when they were student athletes. That's the only thing that they alleged has harmed them to this day that prevents them from getting paid to this day because there is no NCAA rule that prohibits former student athletes from being compensated for their NIL. The plaintiffs made an allegation to the contrary. We pointed out that there is literally nothing in the NCAA rulebook that prohibits former student athletes from getting paid. There has never been any response to that. And in fact, in O'Bannon, Judge Wilkin found that there is no such restriction on former student athletes. So you have an old agreement that's alleged that they signed, and their claim is that that agreement and us holding them to that agreement is what is precluding them from being paid to this day. And that does not defeat the statute of limitations because the case law is clear that when you are challenging continued performance under an old contract, you can't reach past the four years. I think there's a raft of cases we've cited in our briefs, from the U.S. Airways case to the MSG case to the SIPRA-Flaxson case to the SLX case, all from district courts in this circuit or in the case of U.S. Airways that embody that principle. There's cases from other circuits, CSX from the Fourth Circuit, Aurora from the Ninth Circuit, that say the same thing. And through multiple rounds of briefing and argument, the plaintiffs have not been able to identify a single case that announces a contrary rule. I think the closest they've come is by highlighting this court's decision in Berkey Photo. But if you look at that decision, it actually supports us because Berkey Photo says that in a case where there's a claimed monopolization or a claimed conspiracy, and the people suing are the rivals, rival producers, you have an obligation to sue at the moment the anti-competitive practice occurs. And in paragraph 7 of their complaint in this case, and as well at pages 62 and 67 of oral argument, plaintiffs conceded that their claim is that they are rival suppliers to the NCAA. And as a rival supplier, they had to sue when the contract first occurs effectively. So we think that that alone defeats the continuing violations theory. On the equitable estoppel piece, Your Honors, the plaintiffs have to make an extraordinary showing that there was some circumstance that prevented them from filing suit, and they haven't done that. The only extraordinary circumstance I believe they've alleged are publicly known facts. As Your Honors pointed out, the NCAA's rules have been an open book for a very long time. The fact that student athletes did not for a long time get compensated for their NIL has been very well known. I don't think there's a single case that they've identified that says you can call an extraordinary circumstance for equitable tolling purposes something that was publicly known to the whole world. And then they would still have to show that whatever that circumstance was, somehow we did something to cause them to not file suit. And there is no way to make that showing when, as Your Honors have pointed out, multiple student athletes have sued us over this exact same set of issues going back to 2009. O'Bannon was filed in 2009. Alston was filed in 2014. House was filed in 2019. Alston was decided in 2021. And still the complaint in this case didn't come until 2024. Last, there's speculative damages. I don't think that was addressed earlier. I think it was largely addressed earlier. Counsel, the most interesting sort of argument to me that the other side made was that if somebody, if a group of people individually or collectively did something wrong in the past, and now one of them wants to make up for it and voluntarily give something and would do it but for the collective group telling him not to, that is an antitrust violation. Now, that isn't really clearly stated anywhere before, but it was an oral argument. And it's kind of an interesting argument. Could you address that? I'd be happy to, Your Honor. I think the answer to that is the point I mentioned earlier. There is actually no rule that prohibits schools from paying former student athletes for their NIL. There's no such restriction. I think the reason that schools are not paying former student athletes for that, if there is one, is because student athletes litigated that claim in O'Bannon and lost. And Judge Wilkin concluded that there is no antitrust requirement to pay former student athletes for their NIL. So the reason that students are getting paid today, or former student athletes are not getting paid today, is not the product of any antitrust conspiracy. Even if one had been alleged, as Your Honor pointed out, that hasn't been alleged here. Thank you. Can I ask you about the laches agreement on the injunctive relief? It requires, well, it potentially requires prejudice, right? Can you just talk me through what your best argument is on that? Sure, Your Honor. I think there's two points on that. The first is the prejudice is that we have litigated this claim already. My second answer is the preclusion piece, just to foreshadow. But the prejudice is that this claim has been litigated before, and the plaintiffs lost it. All of the plaintiffs, indisputably, were members of the O'Bannon class. They litigated the exact same claim that's been presented here. I think Judge Engelmeyer pointed out the similarities between the complaints. We pointed out the similarities between the complaints. Many of the allegations in the complaint here are verbatim or close to verbatim from O'Bannon. So we took this case to trial against a group that included these plaintiffs. We won. Coming back and having to relitigate it again 20 years later, based on evidence that's even older than the evidence in O'Bannon, is prejudicial. But I think even if Your Honors had any questions about the latches issue, the preclusion would take care of it. Clearly, the plaintiffs in this case, from our perspective, are precluded both by issue preclusion and by claim preclusion from relitigating the injunctive claims in O'Bannon. If Your Honors don't have any other questions, we believe that the judgment below should be affirmed. All right. Thank you, counsel. Thank you. And Mr. Abrams, you've reserved two minutes. Thank you, Your Honors. On the preclusion issue, the use is in question here post-date O'Bannon. And while I understand Mr. Kalaru's concept that they litigated and they say they won, O'Bannon was a situation in which the court first recognized that you can't use student-athletes' images and likenesses for third-party uses. And so that's what we've alleged here. So that piece of it, the student-athletes won. And so the NCAA then continues to do that by using our names, images, and likenesses to make money from third parties. So this conduct at issue here post-dates O'Bannon, and we have the Techno Marine case that discusses that issue. As to the argument that Alston precludes our damages claims, Your Honors, the district court in Alston explained that Alston, quote, was not connected to NIL rights. That's at 325 F sub 3rd, 1094. And so Alston is not preclusive because it did not address this issue. Your Honors, we have a question about whether we signed away these rights. That is a question that requires factual development. We do not believe that we have pled ourselves out of these rights because throughout our complaint, we allege we still have these rights. We included the release that we believe we signed in the context so that we would get out ahead of what is actually an affirmative defense. And what's happening now is that affirmative defense was granted effectively at 12B6. We believe that we have pled an ongoing price-fixing conspiracy. It's what we say in Claim 1, an ongoing price-fixing conspiracy about past student-athletes, past performances. So what's at Claim 1, Your Honors, is not time-barred, and we ask Your Honors to let us go forward. Thank you so much. All right. Thank you all for your time. We appreciate your arguments. We'll take the matter under advisement. Next up, we'll hear from the matter of United States v. DNSSA. Case numbers, thank you, 24-1091. All right. Counsel, you've reserved two minutes for rebuttal. You may begin whenever you're ready. Thank you. May it please the Court, my name is Harlan Protus, and I am here representing Defendant Appellant Gurmeet Singh DNSSA. I fully recognize that DNSSA's case is an old case. He was arrested in July of 1997. He was convicted at trial in January 1999 after a four-month trial, represented by Jerry Shargell. Benton Campbell, who rose to become the U.S. Attorney in the Eastern District, was the prosecutor on the case. But just because DNSSA's case is old, and just because it emanates from an amended judgment that could have been but was never entered years ago, doesn't mean that his appeal is jurisdictionally defective and does not mean that the substantive issues that he raises do not have merit. Counsel, even assuming that we can go back and look at this because the judge did not formally make the final order, which is dubious, but even assuming that, aren't your claims lost anyway? The Booker claim does not stand up under our cases. And the Apprendi case, which might, is barred by the fact that the overwhelming evidence is such that any Apprendi error would be harmless. And Apprendi is subject to harmlessness rule. So if that is so, then you don't have anything now, no claim to be re-sentenced specifically because of a very narrow exception of powers, which even I and Kaizu insisted on in the face of some argument by another judge on this court. Who was right? Whichever. I mean, even I who was most your way would say this is a case that is barred in vain. Well, thank you for that question, Judge. As I understand it, what you're saying, and correct me if I'm wrong, and I want to make sure I get your question correct, is that even if the court determines that it has jurisdiction, and even if it rules in your way, Mr. Protas, even then you lose because your client is serving mandatory minimum life sentences. Well, we have to say that your claim against the other sentences, the Apprendi claim, fails because obviously if the other life sentences are thrown out, then it's a different situation. Right. Well, I have a number of answers to that, Judge. I mean, obviously the initial appeal was decided before Apprendi and before Booker. So the court did not have the benefit of those decisions when sentencing Mr. Dinsa. Secondly, it's impossible to know what the effect of Apprendi or Booker would have had on those sentences. And not every offense for which Mr. Dinsa was convicted was a life mandatory minimum sentence. And that has collateral consequences as well as to the conditions of confinement, his placement within the BOP, his eligibility for programming, and certain other things that I don't think that many defense lawyers really think about because it's not legal legal, but it is the real life of our clients. It's also impossible to know what future legal developments, legal or otherwise, might impact Dinsa's mandatory minimum sentences. And I think most importantly, if you're going to imprison another human being for the rest of their days, for the remainder of their life, without any way to get out of prison, it has to be done the right way. And in this case, it was not done the right way. And when the consequences are as high as they are here, my view, I think our view, is that all the I's have to be dotted, all the T's have to be crossed. Well, can I ask a different version perhaps of that question? Aren't you really attacking this court's decision in the direct appeal of the conviction? Because as I read our mandate in the case, it says we affirm the judgment of conviction and sentence on all counts. We vacate the judgment of conviction only on the three counts and remanded only for the following purpose, which is to have a new trial if the government wants one. The government didn't want one. Now, I'm prepared to assume that the – and I think I'd be prepared to rule that the fact that the district court never entered a new judgment means we are now looking at the district court's judgment that came – from which you have appealed in a timely way. But where – what is wrong with that judgment?